UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:10-cv-74-H
(Electronically Filed)

SHAMROCK MARKETING, INC.
   11206 Bluegrass Parkway
   Louisville, Kentucky 40299                      PLAINTIFF

v.

BRIDGESTONE BANDAG, LLC
   2905 N. Highway 61
   Muscatine, Iowa 52761                          DEFENDANT

**COMPLAINT**

For its Complaint against Defendant, Bridgestone Bandag, LLC ("Bandag"), Plaintiff, Shamrock Marketing Inc. ("Shamrock") alleges as follows:

**PARTIES**

1. Shamrock is a corporation created and existing under the laws of the Commonwealth of Kentucky with its principle place of business located at 11206 Bluegrass Parkway, Louisville, Kentucky 40299. Shamrock is engaged in the business of supplying "curing envelopes" and other "accessories" to "precured" tire retreading shops.

2. Bandag is a corporation created and existing under the laws of the State of Iowa with its principle place of business located at 2905 N. Highway 61, Muscatine, Iowa, 52761-5809. As stated in a Form 10-K filed in 2006 with the Securities and Exchange Commission, Bandag describes its business as:

> consist[ing] of the franchising of a proprietary process for the retreading of tires primarily for trucks, buses, light commercial trucks, and the production and sale of precured tread rubber and related products and equipment used in connection with this process. The [business] can be

divided into two main areas: (i) manufacturing the tread rubber and (ii) providing and supporting the retreading system to bond the tread rubber to the tire casing. Bandag manufactures over 500 separate tread designs and sizes, treads specifically designed for various applications, allowing fleet managers to fine-tune their tire programs.  Bandag tread rubber is vulcanized prior to shipment to its franchisees.  The Bandag franchisee prepares the tire casing for retreading and performs the retreading process of bonding the cured tread to the prepared tire casing.  This two-step process allows utilization of the optimum temperature and pressure levels at each step.  Using optimum temperature levels during the bonding process results in a consistent, higher quality finished retread with less damage to the casing.  Bandag has developed a totally integrated retreading system with the materials, bonding process and manufacturing equipment specifically designed to work together as a whole.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 in that Shamrock asserts claims arising under the Sherman Act, 15 U.S.C. §§1 and 2.

4. Venue is proper in this District pursuant to 28 U.S.C. §1391 and 15 U.S.C. §22.

## FACTUAL ALLEGATIONS

5. Bandag's "franchising of a proprietary process for the retreading of tires" has resulted in Bandag having more than 300 franchisees in the United States.

6. Bandag and its franchisees enter into written franchise agreements.

7. The tire retreading shops operated by the Bandag franchisees under these franchise agreements utilize the "Bandag Process" for tire retreading.

8. The "Bandag Process" for tire retreading is known as a "precure" method of tire retreading, meaning that a strip of "precured" tread rubber is bonded to the "casing" of a used tire to create a retreaded tire.

2

9. The strip of "precured" tread rubber already has the tread design created on its surface.

10. The used tire to be retreaded is first "buffed" to remove any remaining tread, leaving a "casing" suitable for retreading.

11. After "buffing," an uncured "bonding layer" (or "cushion gum") is applied to the "casing" surface.

12. After application of the uncured "bonding layer" (or "cushion gum"), the strip of "precured" tread rubber with the desired tread design is applied on top of the uncured "bonding layer" (or "cushion gum").

13. At this point, the assembled "casing," uncured "bonding layer" (or "cushion gum"), and "precured" tread rubber are enclosed in a "curing envelope" made of elastic rubber.

14. The "curing envelope" is sealed and the air inside it is removed to create a vacuum, which has the effect of applying consistent pressure to the "precured" tread rubber, "casing," and uncured "bonding layer" (or "cushion gum").

15. After enclosure in the "curing envelope," the entire assembly is placed in an autoclave that provides the correct heat and pressure to cause the uncured "bonding layer" (or "cushion gum") to "cure" (or "vulcanize"), which has the effect of permanently affixing the "precured" tread rubber to the "casing."

16. When "curing" of the "bonding layer" (or "cushion gum") is complete, the "curing envelope" and its contents are removed from the autoclave, the "curing envelope" is removed, and the result is a retreaded tire ready for use.

17. The "curing envelopes" used in this "precured" method are reusable, meaning that it is possible for a tire retreading shop to reuse a single "curing envelope" to retread over 200 tires.

18. At times relevant to this litigation, the franchise agreements between Bandag and its franchisees have required the franchisees to purchase all of their "precured" tread rubber from Bandag.

19. In contrast, at times relevant to this litigation, the franchise agreements did not require that the franchisees purchase "curing envelopes" or other items commonly referred to as "accessories" from Bandag.

20. Accordingly, prior to the events involved in this litigation, Bandag franchisees bought "curing envelopes" and "accessories" from suppliers other than Bandag.

21. Shamrock was among the other suppliers of "curing envelopes" and "accessories" from which Bandag franchisees purchased these items.

22. On December 4, 2007, Bandag instituted a price increase on the "precured" tread rubber its franchisees are required to purchase from Bandag.

23. Simultaneously, on December 4, 2007, Bandag also instituted what it denominated the "Q-Fund."

24. Bandag franchisees had no choice over whether or not they would participate in Bandag's "Q-Fund" program.

25. Under the terms of the "Q-Fund," a "Q-Fund" account is automatically created for each franchisee and it is "credited" with $0.05 per pound of the "precured" tread rubber required to be purchased by that franchisee from Bandag.

26. The "credit" to a franchisee's "Q-Fund" account is not available to the franchisee in cash, but may only be "spent" by applying it to the purchase of "curing envelopes" and certain other designated "accessories" from Bandag; and, if the "credit" is not so used within a designated time frame the franchisee loses the "credit" to its "Q-Fund" account.

27. Because a Bandag franchisee (1) must purchase all of its "precured" tread rubber from Bandag; and (2) Bandag simultaneously increased the price of its "precured" tread rubber at the time of introduction of the "Q-Fund," Bandag franchisees have paid to Bandag the $0.05 per pound of "precured" tread rubber "credit" to their "Q-Fund" account.

28. Because they have so paid the $0.05 per pound of tread rubber "credit" into their "Q-Fund" accounts, and they will lose that "credit" if it is not utilized in a specified time period, the Bandag franchisees are economically coerced to agree to apply the $0.05 per pound of tread rubber "credit" in their "Q-Fund" accounts to acquire "curing envelopes" and other "Q-Fund"-designated "accessories" from Bandag.

29. The economic coercion also results from the facts that the $0.05 per pound of tread rubber has already been paid in full by franchisees by Bandag's raise in the price of the required purchases of "precured" tread rubber, and due to the quantity of "precured" tread rubber purchased by franchisees, it is sufficient to totally or nearly totally offset Bandag's price for "curing envelopes" and other "Q-Fund"-designated accessories.

30. For competing sellers of "curing envelopes" and other "Q-Fund"-designated "accessories," the above-described structure and resulting coercive effect of

5

the "Q-Fund" has had the anti-competitive effect of excluding them from selling their competing "curing envelopes" and other "Q-Fund"-designated "accessories" to Bandag franchisees.

31.     Prior to the institution of the "Q-Fund," Shamrock was such a substantial supplier of "curing envelopes" and other "Q-Fund"-designated "accessories" to Bandag franchisees.

32.     Prior to the institution of the "Q-Fund" on December 4, 2007, Shamrock was selling about 18,000 "curing envelopes" per year to Bandag franchisees.

33.     After the institution of the "Q-Fund" on December 4, 2007, Shamrock's sales of "curing envelopes" to Bandag franchisees immediately began falling and have dropped by approximately 90%.

34.     The cause of the immediate and large decline of Shamrock's sales of "curing envelopes" can only be attributed to Bandag's institution of the "Q-Fund" inasmuch as Shamrock's prices for its "curing envelopes" were below Bandag's prices for its "curing envelopes."

35.     The actions of Bandag described above have damaged Shamrock in its business and property in that it has lost profits on sales it had been making, and would have continued making, to Bandag franchisees of "curing envelopes" and "Q-Fund"-designated "accessories," and the value of Shamrock's business has severely declined.

## COUNT ONE

36.     Paragraphs 1 through 35 are incorporated by reference as if fully stated.

37.     The actions of Bandag associated with the Q-Fund constitute a tying arrangement in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

6

38. The relevant geographic market is the United States inasmuch as Bandag does business throughout the United States.

39. The tying product is "precured" tread rubber, which Bandag franchisees are required to purchase from Bandag under their franchise agreements.

40. The tied products are "curing envelopes" and other "Q-Fund"-designated "accessories" which Bandag franchisees utilize in the process of retreading tires.

41. The relevant market for the tying product – "precured" tread rubber – is for the sale of that product to Bandag franchisees inasmuch as Bandag franchisees are not only required by the franchise agreements to purchase all "precured" tread rubber from Bandag, but also Bandag franchisees are "locked-in" to Bandag because the costs of switching to another tire retreading system are excessive compared to the added costs of the "Q-Fund."

42. Because of these circumstances, Bandag has 100% of the market for the tying product – "precured" tread rubber – and has economic and market power over that tying product.

43. Bandag's establishment of the "Q-Fund" is an unlawful exercise of its economic and market power over the tying product – "precured" tread rubber – to restrain trade in the market for the tied products, "curing envelopes" and other "Q-Fund"-designated "accessories," as evidenced by Shamrock's substantial decline in sales of the tied products to Bandag franchisees immediately following institution of the "Q-Fund."

44. Bandag actions associated with the "Q-Fund" have affected a not insubstantial amount of interstate commerce in the market for the tied products inasmuch as millions of dollars of the tied products – "curing envelopes" and other "Q-Fund"-

designated "accessories" – shipped in interstate commerce have been and continue to be affected.

45. Pursuant to 15 U.S.C. §15, Shamrock is entitled to recover treble damages and attorneys fees for the above-described *per se* violation of §1 of the Sherman Act, 15 U.S.C. §1.

## COUNT TWO

46. Paragraphs 1 through 45 are incorporated by reference as if fully stated.

47. Alternatively, the relevant market for the tying product—"precured" tread rubber – is for the sale of that product to all purchasers.

48. Bandag possesses approximately 50% of the market for the sale of the tying product – "precured" tread rubber – to all purchasers, and, consequently, it has economic and market power over that tying product.

49. Bandag's establishment of the "Q-Fund" is an unlawful exercise of its economic and market power over the tying product – "precured" tread rubber – to restrain trade in the market for the tied products, "curing envelopes" and other "Q-Fund"-designated "accessories," as evidenced by Shamrock's substantial decline in sales of the tied products to Bandag franchisees immediately following institution of the "Q-Fund."

50. Bandag actions associated with the "Q-Fund" have affected a not insubstantial amount of interstate commerce in the market for the tied products inasmuch as millions of dollars of the tied products – "curing envelopes" and other "Q-Fund"-designated "accessories" – shipped in interstate commerce have been and continue to be affected.

51. Pursuant to 15 U.S.C. §15, Shamrock is entitled to recover treble damages and attorneys fees for the above-described *per se* violation of §1 of the Sherman Act, 15 U.S.C. §1.

## COUNT THREE

52. Paragraphs 1 through 51 are incorporated by reference as if fully stated.

53. Alternatively, the above-described actions of Bandag associated with the "Q-Fund" constitute a tying arrangement in violation of §1 of the Sherman Act, 15 U.S.C. §1, under a Rule of Reason analysis.

54. The actions of Bandag have unreasonably restrained trade in the market for the sale of "curing envelopes" and other "Q-Fund"-designated "accessories" in that they have excluded Shamrock and other suppliers from sales of these products to Bandag franchisees, and the resulting costs to Bandag franchisees for these items have been increased.

55. Pursuant to 15 U.S.C. §15, Shamrock is entitled to recover treble damages and attorney's fees for the above-described Rule of Reason violation of §1 of the Sherman Act, 15 U.S.C. §1.

## COUNT FOUR

56. Paragraphs 1 through 45 are incorporated by reference as if fully stated.

57. Bandag has 100% of the relevant market for the sale of "precured" tread rubber to its franchisees, and has monopoly power over that relevant market.

58. The above-described actions of Bandag associated with the "Q-Fund" have been willful and unlawful exercises of Bandag's monopoly power over "precured"

tread rubber which have had exclusionary and anti-competitive effects with respect to sales of "curing envelopes" and "Q-Fund"- designated "accessories."

59. Bandag's willful and unlawful exercise of its monopoly power over "precured" tread rubber has excluded Shamrock and other suppliers of "curing envelopes" and other "Q-Fund"-designated "accessories" from sales of those items to Bandag franchisees, resulting in Bandag's monopolization of these markets.

60. The above-described actions of Bandag associated with the "Q-Fund" constitute monopolization in violation of §2 of the Sherman Act, 15 U.S.C. §2.

61. Pursuant to 15 U.S.C. §15, Shamrock is entitled to recover treble damages and its attorney's fees for the above-described violation of §2 of the Sherman Act, 15 U.S.C. §2.

## RELIEF

WHEREFORE, Plaintiff, Shamrock Marketing, Inc. demands a judgment against Defendant, Bridgestone Bandag, L.L.C., as follows:

1. Determining that Bandag has violated §1 of the Sherman Act, 15 U.S.C. §1 by virtue of the actions of Bandag described in Counts One, Two and Three;

2. Determining that Bandag has violated §2 of the Sherman Act by virtue of the actions of Bandag described in Count Four;

3. Pursuant to 15 U.S.C. §15, awarding Shamrock treble the amount of damages it has suffered as a result of Bandag's violations of §1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, plus an award to Shamrock of its attorney's fees,

4. Awarding Shamrock its costs of pursuing this action,

5. Awarding Shamrock all other relief to which it may appear entitled; and

6. Shamrock demands a trial by jury of all claims so triable.

        Respectfully submitted,

        <u>/s/ Merrill S. Schell</u>
        M. Stephen Pitt
        Merrill S. Schell
        WYATT, TARRANT & COMBS, LLP
        2800 PNC Plaza
        500 W. Jefferson St.
        Louisville, Kentucky 40202
        502.589.5235

        Counsel for Plaintiff, Shamrock Marketing, Inc.

20323802.1