UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:10-CV-74-H

SHAMROCK MARKETING, INC.                                                          PLAINTIFF

V.

BRIDGESTONE BANDAG, LLC.                                                          DEFENDANT

**MEMORANDUM OPINION**

Shamrock Marketing, Inc. ("Shamrock") filed a four-count complaint against Bridgestone Bandag, LLC ("Bandag"), alleging that Bandag implemented a tying arrangement that unlawfully restrains competition in violation of Section 1 (15 U.S.C. § 1) and Section 2 (15 U.S.C. § 2) of the Sherman Act. Bandag has moved to dismiss Shamrock's claims on the grounds that Shamrock lacks standing to bring such claims, that Shamrock failed to establish the existence of an actual tying arrangement, and that Shamrock's definition of the relevant market in Counts I and IV is flawed.

This motion raises some difficult questions at the intersection of franchise agreements and antitrust enforcement. Defendant has made a strong argument that these claims cannot succeed legally and otherwise. It may be correct. For now and for the reasons explained below, however, the Court will sustain Bandag's motion in part, and deny it in part.

I.

At this stage, the Court must consider Shamrock's allegations as true.

Shamrock is a family-owned Kentucky corporation that supplies "curing envelopes" and other accessories to tire retreading shops, including Bandag franchisees. Bandag is a tire retreading company based in Muscatine, Iowa, which owns and franchises the "Bandag Process"

for retreading tires. The Bandag Process consists of stripping the old tire of its tread, which creates a "casing," then attaching the casing to a "bonding layer," and finally attaching the bonding layer to precured tread rubber. The casing, bonding layer, and precured tread rubber are then enclosed in a round elastic case called a curing envelope. After removing the excess air from the curing envelope, the entire assembly is placed in a "curing chamber" that applies the necessary heat and pressure to cause the bonding layer to cure, permanently affixing the precured tread rubber to the casing.[1]

Bandag has entered into Bandag Dealer Franchise Agreements (the "Franchise Agreement") with approximately 300 tire dealerships in the U.S. and Canada who use the Bandag Process, sell Bandag retreaded tires, and provide maintenance and support services to Bandag customers. Bandag requires its franchisees to purchase all of their precured tread rubber from Bandag. The section of the Franchise Agreement entitled, "Product Purchase Requirements," also states:

> If certain tire retreading equipment or machinery is a specific requirement for use in the Process, as specified in the Manual(s) for the Dealership, then you agree to purchase or lease it from us. We will sell to you, and you agree to purchase from us, your entire requirements of Materials for use in the Process. Prices are subject to change. All other supplies, equipment, inventory and fixtures purchased for use in the Process must comply with requirements prescribed periodically in the Manual(s).

The Franchise Agreement defines "Materials" as "Bandag tread, cushion gum, repair gum, repairs (patches), and certain other proprietary materials we make or distribute." Thus, the term "Materials" admittedly does not mention curing envelopes. However, Bandag also provides all of its franchisees with the Franchise Disclosure Document, which says, "If your Franchise

---

[1] The Bandag method of retreading tires is also known as the pre-cure, or cold-bonding method. The most prevalent alternative retread method is the mold cure method.

Agreement licenses you to operate a Production Facility, you must purchase your entire requirement of Materials and you must purchase or lease all of your tire retreading equipment and machinery from Bandag or its affiliates." Consequently, Bandag maintains that it retained the right to require franchisees to purchase equipment used in the Bandag Process from Bandag, including curing envelopes.

On December 4, 2007, Bandag announced creation of something called the Q-Fund, which provides incentives for its franchisees to purchase curing envelopes and other accessories from Bandag. Every franchisee must participate in the Q-Fund program. Each franchisee has a Q-Fund account which is automatically credited with $0.05 for every pound of precured tread rubber purchased from Bandag. The credited funds may only be spent purchasing designated Bandag and Bandag-sponsored accessories, including curing envelopes.[2] If not used within eighteen (18) months, the credit is lost. However, franchisees are not forced to use the credit. They may purchase curing envelopes and other accessories from third parties.

On the same day that it instituted the Q-Fund, Bandag raised the price of precured tread rubber by $0.12/lb, or 5 percent.[3] Bandag claims that the Q-fund was intended: 1) to promote the sale of Bandag accessories by standardizing the products used in the Bandag Process; and 2) to help franchisees absorb necessary price increases.

Shamrock claims that the Q-Fund totally or nearly totally offsets the price for Bandag curing envelopes. As a consequence, Sharmrock has experienced a 90% decrease in its sales of

---

[2] Both Bandag-brand curing envelopes and DuraCure curing envelopes are available through the Q-Fund. The Court assumes that Bandag has a financial incentive in the sale of DuraCure curing envelopes, and for the rest of the opinion, refers to both brands as simply Bandag curing envelopes.

[3] The total price per pound of pre-cured tread rubber after the price increase was $2.40.

3

curing envelopes to Bandag franchisees since Bandag's implementation of the Q-Fund.

II.

The complaint alleges an unlawful tying arrangement under four separate factual circumstances. In other words, each count of the complaint alleges a tying arrangement under a different set of assumed market circumstances.

The common theme of each count is that Bandag's Q-Fund incentive program creates an unlawful tying arrangement. The Q-Fund does this, the complaint alleges, by unlawfully tying the sale of precured tread rubber to the sale of Bandag curing envelopes and other Bandag accessories. This amounts to an unlawful restraint on competition.

Specifically, Counts I and II contend that the alleged tying arrangement is a *per se* violation of 15 U.S.C. § 1. A *per se* violation requires a certain economic "clout" in the tying market. These two counts differ only in their definition of the relevant tying product market. Count I uses the sale of precured tread rubber to Bandag franchisees as the relevant market; Count II uses a broader market, the sale of precured tread rubber to all purchasers in the entire United States.

Count III asserts that the alleged tying agreement violates 15 U.S.C. § 1 under a Rule of Reason analysis, incorporating both market definitions. Finally, Count IV alleges that Bandag has monopoly power and that the tying arrangement is a willful and unlawful exercise of that power in violation of 15 U.S.C. § 2. This count incorporates only the narrower market definition from Count I – the sale of precured tread rubber to Bandag franchisees.[4]

---

[4] This is the only market definition under which Bandag might conceivably exercise monopoly power. Shamrock claims that the relevant geographic market for all counts is the United States. Bandag has not disputed defining the relevant geographic market as such, therefore the Court accepts Shamrock's proposed geographic market definition.

Bandag has moved to dismiss on the grounds (1) that Shamrock lacks standing, (2) that the narrow, single-brand market defined in Counts I and IV of the complaint is inappropriate, and (3) that pleading an inferred tying arrangement requires dismissal.

To survive a motion to dismiss, a plaintiff's Sherman Act allegations must support a plausible finding of the alleged violation. *Churchill Downs Inc. v. Thoroughbred Horsemen's Group, LLC*, 605 F. Supp. 2d 870, 887 (W.D. Ky. 2009). "*Twombly* established that antitrust complaints are held to a 'plausibility standard,' which requires Plaintiffs to plead 'enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *Id.* at 886 (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). Factual allegations must constitute more than a mere recitation of the elements of the cause of action; however, the allegations need not be detailed in order to survive a motion to dismiss. *Id.* at 887 (citing *Twombly*, 127 S. Ct. at 1964-65).

## III.

The Court must first consider whether Shamrock has standing to bring these antitrust claims. For this purpose, the Court must assume two things: (1) that the facts in the complaint are true, and that (2) those facts actually amount to an antitrust violation of some kind. *Id*. at 880. To establish standing, the Sixth Circuit has said that an antitrust plaintiff must show "(1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions." *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 88 (6th Cir. 1989).

The purpose of the first factor is the ensure that plaintiffs allege antitrust injuries –

injuries on market competition, not individual competitors. *See Id*. "The fact that a particular competitor in a particular market has lost profits does not inevitably mean that competition as a whole is lessened." *Id.* Shamrock alleges that the Q-Fund creates an illegal tying arrangement that eliminates competition throughout the market for curing envelopes and accessories. Assuming the allegations in Shamrock's complaint as true and that there are more facts that further support an antitrust violation, it does seem plausible that all other competitors suffered a reduction in sales of curing envelopes similar to the 90% reduction suffered by Shamrock.

Bandag, relying on the requirements as stated in *Midwest Agency Services, Inc. v. JP Morgan Chase Bank*, No. 2: 09-165-DCR, 2010 U.S. Dist. LEXIS 22457 (E.D. Ky. Mar. 11, 2010), argues strenuously and quite effectively that Shamrock did not allege a decrease in market competition with sufficient specificity. In *Midwest Agency*, the Eastern District of Kentucky found that the plaintiff had not stated an antitrust injury with sufficient specificity because it did not provide facts such as the number of market competitors actually affected. *Midwest Agency,* 2010 U.S. Dist. LEXIS 22457, at *11. This is an interesting decision, but it does not govern the result here. Quite frankly, it seems to impose a standard somewhat beyond that of plausibility which *Twombly* establishes. Of course, to find standing now is merely a preliminary ruling. Shamrock must establish actual market injury through evidence. At this point in the proceedings, the Court finds that Shamrock has sufficiently pled an antitrust injury.

As for the second factor, the "plaintiff must allege that the antitrust violation is either the 'necessary predicate' for its injury or the only means by which the defendant could have caused its injury." *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 900 (6th Cir. 2002). "[D]ismissal is warranted only where it is apparent from the allegations in the complaints that the plaintiffs'

injury would have occurred even if there had been no antitrust violation." *Id*. at 914. Shamrock alleges that after the implementation of the Q-Fund sales of its curing envelopes to Bandag franchisees began falling immediately and have declined by approximately 90%. For our purposes at this stage, the injury to Shamrock and to the market for that matter, appears temporally and causally related to the implementation of the Q-Fund.

Thus, the Court finds that Shamrock's allegations are sufficient to confer antitrust standing.[5]

IV.

The Court now considers the elements of a tying claim. To establish a *per se* tying arrangement, Shamrock must show (1) a tying arrangement between two distinct products or services; (2) sufficient economic power in the tying market to restrain appreciably competition in the tied product market; and (3) a not insubstantial effect on commerce. *Virtual Maintenance, Inc. v. Prime Computer, Inc.*, 11 F.3d 660, 664 (6th Cir. Mich. 1993) [hereinafter, *Virtual Maintenance II*] (citing *Virtual Maintenance, Inc. v. Prime Computer, Inc.*, 957 F.2d 1318,1323 (6th Cir. 1992), *modified on other grounds*, 113 S. Ct. 314 (1992) [hereinafter *Virtual Maintenance I*]). Bandag raises serious questions whether Shamrock has established the first two elements.[6] The Court will consider each issue in turn.

A.

---

[5] Shamrock never claimed that it suffered a decline in its sales of "accessories," and it never provided any facts sufficient to establish an antitrust injury with regard to accessories. Thus, the Court finds that Shamrock does not have standing to bring a claim relating to Bandag's sale of accessories, and that it is necessary to limit the definition of the tying product to curing envelopes.

[6] In its complaint, Shamrock alleges that millions of dollars of the tied products are affected. Bandag does not dispute this claim, thus the Court accepts that Shamrock has satisfied the third element of the *per se* tying claim test.

7

The first element of a tying claim actually contains two parts. First, the tying and tied products must be two separate products rather than a functionally integrated single product. The Sixth Circuit has said that two products are separate products if there is "sufficient consumer demand so that it is efficient for a firm to provide [one product separately from the other]." *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 815 (6th Cir. 1997) (quoting *Eastman Kodak v. Image Technical Services, Inc.*, 504 U.S. 451, 462 (1992)). This is so here. Bandag has independent consumer demand for precured tread rubber from its franchisees; Shamrock's business model alone is proof of sufficient consumer demand for curing envelopes. Precured tread rubber and curing envelopes are indeed two distinct products which are used separately in the same process.

The second part – whether a tying arrangement exists – raises a more difficult question. Bandag argues that its sale of precured tread rubber is not conditioned on the sale of curing envelopes. Indeed, its franchisees are free to purchase curing envelopes from Shamrock or any other qualified supplier. A traditional tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5-6 (1958). However, courts have found tying arrangements where the buyer's only economically viable option is to purchase both the tying and the tied product.[7]

---

[7] *See Data Gen. Corp. V. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1180 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237 (2010); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992). Courts have also inferred the existence of a tying arrangement where the circumstances surrounding a transaction, for all practical purposes, force a buyer into purchasing the tied product. *See Tic-X-Press, Inc. v. Omni Promotions Co.*, 815 F.2d 1407, 1418 (11th Cir. 1987); *Tire Sales Corp. v. Cities Service Oil Co.*, 637 F.2d 467, 474 (7th Cir. 1980); *Bogosian v. Gulf Oil, Co.*, 561 F.2d 434, 452 (3rd Cir. 1977), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007); *Heatransfer Corp. v. Volkswagen, A.G.*, 553 F.2d 964, 977 (5th Cir. 1977); *Advance Bus. Sys. v. SCM Corp.*, 415 F.2d 55, 64 (4th Cir. 1969).

More relevant for this Court, the Sixth Circuit has found a tying arrangement when a deal "induces all rational buyers" of the tying product to accept the tied product. *Virtual Maintenance I*, 957 F.2d at 1323, *modified on other grounds*, 113 S. Ct. 314 (1992). In that case, Prime Computer was the exclusive distributor of a Ford Motor Company-owned computer program used in designing Ford automobiles. Ford required designers to use only the newest version of the program, and Prime Computer also sold the software support necessary to ensure that designers indeed had the newest version. Prime Computer sold the software support as part of a package that included Prime Computer's hardware maintenance. Although the automobile companies were free to buy the hardware maintenance elsewhere, the cost of the package from Prime Computer was $16,000 per year while the cost of the software support without the hardware maintenance varied from $80,000 to $160,000 per year. The Court concluded that "[a] tying arrangement clearly exists here because the large price differential...induces all rational buyers of Prime's software support to accept its hardware maintenance." *Id*.

There can be no doubt that the Q-Fund creates an incentive for franchisees to purchase Bandag curing envelopes. Though the incentive here does not match the one discussed in *Virtual Maintenance I*, it is sufficient that Shamrock claims a 90% decline in curing envelope sales to Bandag franchisees since implementation of the Q-Fund. Assuming that 90% of all buyers are rational, it is plausible to conclude that the Q-fund has induced many, if not all, rational buyers to purchase Bandag curing envelopes. Nevertheless, *Virtual Maintenance I* sets a very high bar for any plaintiff. Courts should only in the rarest of circumstances and under the most coercive of conditions infer a tying arrangement. Though such an arrangement is certainly plausible here, proving actual coercive conditions could be difficult.

In view of this analysis, the Court concludes that Shamrock has met its initial burden in establishing a tying arrangement between Bandag's precured rubber and its curing envelopes.

B.

Next, Shamrock must show that Bandag has sufficient economic power in the relevant tying product market to unlawfully restrain commerce.[8] To analyze economic power, the Court must: (1) define the relevant tying product market, which involves the application of the reasonable interchangeability standard; (2) determine whether the circumstances fit any exception to the standard; and (3) analyze Bandag's market share in the relevant market. In antitrust law, defining the relevant market often decides the case. This may well be true here. The Court will consider each of these issues.

1.

The Sixth Circuit said that the "reasonable interchangeability" standard determines the relevant product market. *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 961 (6th Cir. 2004). This standard requires that the relevant market consist of the tying product and all reasonably interchangeable products. "Reasonable interchangeability 'may be gauged by (1) the product uses, i.e., whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service.'" *Id*. (quoting *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983)).

Bandag alleges that the relevant market is the entire replacement tire market, which includes both new tires and all forms of retreads. At this stage of the proceedings, the Court

---

[8] Absent significant economic power over a relevant market, Shamrock could have a claim only under a Rule of Reason analysis.

respectfully disagrees.  Based upon the allegations of the complaint, this market definition is too broad. Bandag's proposed market definition fails to consider that the relevant market must consist of substitutes for the tying product. The tying product is Bandag precured tread rubber, which Bandag franchisees use in the process of producing retreaded tires. The process itself is specific to precured tread rubber.  Proper substitutes would be any other product that could replace Bandag precured tread rubber in the process of producing retreaded tires.[9]  By this definition, a replacement tire would not be a proper substitute.

Consequently, the Court finds that Shamrock has sufficiently pled the relevant market as the precured tread rubber market in the United States identified in Counts II and III.  Of course, the actual evidence could alter this conclusion.

2.

The Court's relevant market analysis is not complete.  In 1992, the Supreme Court carved out an exception to the reasonable interchangeability standard.  *See Eastman Kodak*, 504 U.S. 451 (1992). That exception allows for a narrower relevant market definition – a single-brand market that does not include available substitutes – where a  plaintiff has become "locked-in" by making an initial purchase of or investment in a defendant's product.  Applying the *Kodak* rule here would define the "market" as solely the Bandag precured rubber market, upon which Bandag exercises absolute control.  In Counts I and IV of its complaint, Shamrock relies upon the *Kodak* exception to narrowly define the relevant market, arguing that Bandag franchisees are locked-in due to the substantial investment that they make in becoming franchisees.

The Sixth Circuit explained that the crucial factor in determining whether to apply the

---

[9] The evidence that retread tires and new tires were roughly equal in cost could change this analysis.  No one has suggested that this is true.

*Kodak* exception is a "change in policy" that occurs after customers are "locked-in." *PSI Repair Services,* 104 F.3d at 820. Seeming to limit *Kodak*, the Sixth Circuit said, "[A]n antitrust plaintiff cannot succeed on a *Kodak*-type theory when the defendant has not changed its policy after locking-in some of its customers, and the defendant has been otherwise forthcoming about its pricing structure." *Id*. Applying this analysis, the Court must determine whether Bandag has changed its policy regarding the sale of curing envelopes after locking-in its franchisees. The Franchise Agreement requires franchisees to purchase all of the tire retreading equipment and machinery from Bandag, as determined by Bandag. Even though Bandag never previously required franchisees to purchase Bandag curing envelopes, it claims always to have possessed the contractual right to do so. Bandag argues that "all retreading equipment" includes curing envelopes, and that its franchisees either were or should have been well aware of this. The Court finds this to be a fair reading of the Franchise Agreement. Thus, in a narrow sense, the *Kodak* exception does not apply and the relevant market is defined according to the reasonable interchangeability standard – precured tread rubber in the United States.

Regardless, Bandag argues that courts have so limited *Kodak*'s scope that it cannot apply here. There is much merit to this view. This Court is far from certain that *Kodak* provides a proper framework of analysis in the franchise context. In the classic *Kodak* case, unsophisticated purchasers become "locked-in" by investing in a product, and then the seller imposes an unforeseeable restriction upon their access to a necessary by-product. *Kodak* does not apply well or at all in the franchise context because franchisees are far from unsophisticated purchasers and rarely are policy changes unforseen. Instead, the parties have negotiated a franchise agreement that often clearly establishes various franchisor rights. In addition, the plaintiffs in *Kodak*

argued that their market for certain replacement parts was limited to owners of *Kodak* photocopy equipment because the parts were specific to that equipment. Here, Shamrock makes no allegation that it sells curing envelopes specifically-designed for use by Bandag franchisees. Thus, the economic circumstances seem so distinguishable that it is difficult to believe that the *Kodak* rule would seem inapplicable to the franchise context.

Regardless of the analysis, the Court cannot find a rationale for defining the relevant market as only the market for Bandag precured rubber. Consequently, Counts I (unlawful tying in the sale of precured rubber to Bandag franchisees) and IV (tying arrangement as an unlawful monopoly) must fail.

3.

The final step in the *per se* tying claim market analysis is to determine whether Bandag has sufficient economic power in the precured tread rubber market. This presents another close question.

Market share is an indicator of market power.[10] Shamrock claims that Bandag has a 50% share of the precured tread rubber market. So far, Bandag has not contested this allegation. The actual percentage of market share is only one factor in determining market power. For example, evidence that the remaining 50% of the precured tread rubber market is fragmented could strengthen Bandag's power in the market. No doubt more evidence and further discovery will illuminate the true extent of Bandag's market power.

---

[10] Formerly, courts allowed plaintiffs to establish a presumption of market power by showing that a defendant had a competitive advantage due to the uniqueness of the tying product or due to legal barriers, such as a trademark, copyright, or patent. However, The Supreme Court's decision in *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006), rejects the legitimacy of such a presumption, particularly as it pertains to patents. *Ill. Tool Works*, 547 U.S. at 45.

13

The best, though limited, guidance this Court can find is a footnote to the Sixth Circuit's decision in *Valley Prods. Co. v. Landmark*, 128 F.3d 398 (6th Cir. 1997), which says that the courts have "repeatedly held that a 30 percent market share is insufficient to confer the market power without which a tie cannot be illegal *per se*." *Valley Prods.*, 128 F.3d at 402, n. 2. Bandag's 50% market share seems sufficiently greater than this to meet the market power requirements. There is no doubt that the Court will need to consider the issue again after additional discovery and analysis of the market. For now, however, the evidence is sufficient.

V.

The Court will now consider Shamrock's claim that the tying arrangement is unlawful under a Rule of Reason analysis as alleged in Count III.

"A tying arrangement which is not *per se* unlawful may be invalidated under the 'rule of reason' if the party challenging the tie demonstrates that it is an 'unreasonable restraint on competition in the relevant market.'" *Beard v. Parkview Hosp.*, 912 F.2d 138, 140 (6th Cir. 1990) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 18 (1984)). Courts determine reasonableness by "taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *In re Cardizem*, 332 F.3d at 906 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (citation omitted)). Considering the staggering decline in Shamrock's sales of curing envelope to Bandag franchisees after Bandag implemented the Q-Fund, and accepting Shamrock's claim that the Q-Fund totally or nearly totally offsets the price for Bandag curing envelopes, it is plausible that the Q-Fund creates significant anticompetitive effects and imposes an unreasonable restraint on competition.

14

"The rule of reason analysis employs a burden-shifting framework," *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003) (citing *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 775 n.12 (1999)), and after the plaintiff has established significant anticompetitive effects, "the defendant must come forward with evidence of the restraint's procompetitive effects." *Id*. (quoting *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001)). Bandag has not presented sufficient information to meet this burden. Therefore, the Court cannot make a plausible finding that the Q-Fund has had procompetitive effects.

Shamrock's Rule of Reason claim remains.

## VI.

Antitrust enforcement has a particularly uneasy relationship with franchisors who may have many valid reasons for wanting to control the activities of their franchisees. As is the case here, those efforts can have economic consequences for third parties.

As a defense to antitrust claims, "[T]he franchisor is free to demonstrate that the tie constitutes a necessary device for controlling the quality of the end product sold to the consuming public." *Kentucky Fried Chicken Corp., v. Diversified Packaging Corp.*, 549 F.2d 368, 376 (5th Cir. 1977). Nonetheless, "[T]he franchisor must establish that the tie constitutes the method of maintaining quality that imposes the least burden on commerce. If there are less burdensome alternatives, a franchisor is obligated to employ them rather than a tie." *Id*.

Although Bandag never explicitly asserts a quality or goodwill defense, it notes that the primary reason for the Q-Fund's existence is to standardize the products used in the Bandag Process, and that the "Q" in Q-Fund stands for quality. A less burdensome alternative to a tying

15

arrangement is to establish clear quality specifications. The Supreme Court noted as much in a footnote to the *Jefferson Parish* decision, where it stated, "[W]e have also uniformly rejected similar 'goodwill' defenses for tying arrangements, finding that the use of contractual quality specifications are generally sufficient to protect quality without the use of a tying arrangement." *Jefferson Parish*, 466 U.S. at 25 n. 42. The Court does not find that Bandag's tying arrangement was necessary for controlling the quality of precured retread tires. If Bandag was truly interested in quality control, alternatives existed that were less burdensome on commerce.

There is no doubt that the nuance of a franchise arrangement complicates the antitrust analysis. This Court has already discussed, for instance, how the *Kodak* exception analysis does not seem suited to the franchise context. Nevertheless, the Court cannot extend that logic to suggest that franchises are somehow outside of the scope of antitrust laws. It is well established that a franchisor can not use its contractual agreement with its franchisees as a shield from antitrust laws. Courts traditionally have shown a willingness to invalidate tying arrangements established by a way of a franchise agreement where the franchisor has sufficient power in the tying product market, where the amount of commerce affected is not insubstantial, and where less burdensome alternatives existed.[11]

---

[11] *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 725 (7th Cir. 1979) (Court affirmed district court's invalidation of requirement in franchise agreement that franchisees lease kiosks from franchisor); *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.*, 463 F.2d 1002, 1016 (5th Cir. 1972) (Where franchisor required, by way of contractual agreement, that franchisees purchase parts manufactured by the franchisor, Court found that jury should have been instructed that the requirement is a per se tying arrangement); *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 51-52 (9th Cir. 1971) (Court affirmed district court's invalidation of requirement in franchise agreement that franchisees purchase certain equipment and packaging from the franchisor); *See also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3rd Cir. 1997) (noting that if Domino's possessed market power, plaintiffs might have a valid tying claim in spite of the fact that Domino's established the tying arrangement by way of its franchise agreement); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 712-13 (11th Cir. 1984) (franchisor required that its franchisees purchase equipment and vending services from approved suppliers, and Court held that if plaintiffs could establish that the only approved suppliers were those with whom the franchisor had a financial relationship, they could prove the existence of an illegal tying arrangement); *Kentucky Fried Chicken Corp., v. Diversified Packaging Corp.*, 549 F.2d 368, 372 (5th Cir. 1977) (Court affirmed district court's decision in

The Court will enter an order consistent with this Memorandum Opinion.

cc: Counsel of Record

---

favor of franchisor, but in doing so, said, "we find that franchisors must walk a narrow path when including in their franchise agreements clauses requiring franchisees to buy supplies from approved sources").